UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OFFICE & PROFESSIONAL EMPLOYEES
INTERNATIONAL UNION, LOCAL #40,

      Plaintiff,      Civil Action No.
                  13-CV-10873
vs.
                  HON. MARK A. GOLDSMITH
CRITTENTON HOSPITAL
MEDICAL CENTER,

      Defendant.
_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

This is an action under the Labor Management Relations Act of 1947, 29 U.S.C. § 141 et seq. (LMRA) to enforce an arbitration award. Plaintiff Office & Professional Employees International Union, Local #40 (the union) represents nurses employed by Defendant Crittenton Hospital Medical Center (the hospital). The union and the hospital are parties to a collective bargaining agreement (CBA). A dispute arose from the CBA concerning the manner in which the hospital schedules the shifts of nurses. Pursuant to the CBA, the dispute was submitted to a labor arbitrator, who ultimately resolved the dispute in favor of the union. However, the hospital refuses to abide by the arbitrator's decision, prompting the union to initiate this lawsuit seeking enforcement of the decision. The hospital argues that the arbitrator's decision should be vacated because it does not "draw[] its essence from the collective bargaining agreement." See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 36 (1987).

Now before the Court are the parties' cross-motions for summary judgment (Dkts. 12, 13). The matter is fully briefed, and the Court heard oral argument on July 25, 2013. For the reasons that follow, the Court will enforce the arbitrator's decision and, therefore, grant the union's motion for summary judgment and deny the hospital's motion for summary judgment.

## II. BACKGROUND

Defendant Crittenton Hospital Medical Center is a hospital located in Rochester, Michigan. Plaintiff Office & Professional Employees International Union, Local #40 represents nurses employed by the hospital. The union and the hospital are parties to a CBA, the pertinent provisions of which are discussed below.

In 2010, nurses working in a particular ward of the hospital were notified that a new method for scheduling their shifts – so-called "pattern" or "block" scheduling – would be implemented. Prior to the change, nurses used a program called "At-Staff" to schedule their shifts. The At-Staff program allowed nurses maximum flexibility in scheduling their hours so as to accommodate their needs outside of work. With the implementation of pattern scheduling in 2010, much of this flexibility was lost.

Having lost the flexibility to which they were accustomed and believing that the hospital's implementation of pattern scheduling violated the CBA, the union filed a grievance on behalf of the nurses affected by the change. In the grievance, the union asserted that the hospital's unilateral decision to change the scheduling protocol offended multiple provisions of the parties' CBA along with the National Labor Relations Act. One of the union's arguments – and the only one that is relevant for the present purposes – was that the hospital's implementation of pattern scheduling violated Article IX, § 6 of the CBA, which provides that "there shall be no normal work day or normal work week for part-time employees." The union

argued that pattern scheduling resulted in the imposition of a "normal work day or normal work" for nurses who were employed on a part-time basis, in a violation of Article IX, § 6.

Pursuant to the terms of the CBA, the parties' dispute was submitted to a labor arbitrator, Stanley S. Dobry, who issued a 34-page decision on February 14, 2013. The arbitrator held, in pertinent part, that pattern scheduling imposes a "normal work day or normal work" on those nurses who are governed by pattern scheduling. The arbitrator also held that nurses who work 12 hours per day for a total of 72 hours per pay period (hereinafter referred to as "12/72-hour nurses") are part-time – not full-time – nurses.[1] The arbitrator's conclusion that 12/72-hour nurses are part-time means that the hospital cannot, in accordance with Article IX, § 6 of the CBA, impose pattern scheduling on 12/72-hour nurses, and the arbitrator held that the hospital violated Article IX, § 6 in doing so.

In reaching the conclusion that 12/72-hour nurses are part-time nurses and not full-time nurses, the arbitrator relied on Article IX, § 2 of the CBA and the testimony of Barbara Chubb, the union's chief steward. Article IX, § 2 of the CBA provides: "Twelve (12) hour bargaining unit employees normally scheduled for seventy-two (72) hours within a given pay period shall be considered full time for purposes of benefits."[2]

The arbitrator also relied on Chubb's hearing testimony. Chubb testified that nurses who work less than 40 hours per week – including 12/72-hour nurses – are part-time and are known internally by the "code status" of "0.9."[3] Arbitration Hr'g Tr. 168-169. The arbitrator relied on

---

[1] Seventy-two hours per pay period translates into 36 hours per week because nurses are paid every two weeks.

[2] This provision does not provide that 12/72-hour nurses are part-time for purposes other than benefits; it only provides that 12/72-hour nurses are full-time for the purposes of benefits.

[3] Chubb explained the hospital's "code status" system during the proceedings before the arbitrator: A nurse with a code status of "1.0" works 40 hours per week; a nurse with a code

this testimony in his decision, writing: "Chubb testified without contradiction from Hospital witnesses that there are no 1.0 point status nurses employed by the Hospital; all are 0.9 point or less and all are considered part time." Id. at 34 n. 28. During her testimony before the arbitrator, Chubb explained that, when the hospital and the union were negotiating the present CBA, the union proposed that 12/72-hour nurses (i.e., nurses with a code status of 0.9) be considered full-time for all purposes – not just for purposes of benefits. Id. at 171. However, according to Chubb, the hospital rejected that proposal, resulting in Article IX, § 2 of the CBA, which provides that 12/72-hour nurses are full-time "for purposes of benefits." Id. The arbitrator noted this in his decision, as well. See Arbitrator Decision at 16 n.3.

In light of Article IX, § 2, combined with Chubb's testimony, the arbitrator found that 12/72-hour nurses are part-time for the purposes of Article IX, § 6 of the CBA. See Arbitration Decision at 33-34. In effect, the arbitrator reached the conclusion that 12/72-hour nurses are part-time by finding an ambiguity in Article IX, § 2 on the question whether 12/72-hour nurses are full- or part-time for purposes other than benefits, and employing the testimony of Chubb (i.e., extrinsic evidence) to resolve the ambiguity. Employing this reasoning, the arbitrator concluded that the hospital violated Article IX, § 6 of the CBA by imposing a "normal work day or normal work week" on 12/72-hour nurses and ordered the hospital to "cease and desist from future contractual violations." Id. at 34.

---

status of "0.9" works three 12-hour shifts per week; a nurse with a code status of "0.6" works two 12-hour shifts per week. In other words, a nurse's code status correlates to the percentage of a full 40-hour work week that is worked by the nurse (e.g., a 12/72-hour nurse works three 12-hour shifts for a total of 36 hours per week, which is 90% of 40 hours, resulting in a code status of "0.9").

The arbitrator presumably did not deem any other provision contained in the CBA to be probative on the issue of whether 12/72-hour nurses are full-time or part-time, because he did not discuss any other provision in his analysis of the issue.[4]

The CBA contains a provision – the first paragraph of Article VII, § 1 – that addresses full-time nurses:

> While regular full-time Registered Nurses have been regularly scheduled in 8, 10, or 12 hour shifts for 36-40 hours of work in a week, the determination of any change in code status for any Registered Nurse shall be made by the Hospital as provided in Article XIV, Section 17. A regular full-time Registered Nurse's Hospital seniority shall date from her most recent starting date of hire by the Hospital. A regular full-time Registered Nurses' bargaining unit seniority shall date from her most recent starting date of work in any classification within the bargaining unit.

This provision was referenced by the arbitrator in the section of his decision entitled "Relevant Contractual Provisions," which consists of seven single-spaced pages of reproduced CBA text. See Arbitrator Decision at 3-9. However, the provision was never referenced again in the arbitrator's decision.

---

[4] However, the arbitrator did discuss several CBA provisions leading up to his conclusions. For example, he noted the "hospital rights" provision of the CBA, which provides that "[t]he Hospital retains . . . the sole and exclusive right . . . to determine . . . the number of hours and which days to be worked, subject only to the express restrictions governing the exercise of these rights which may be expressly provided in [the CBA]." Arbitrator Decision at 29-30 (quoting CBA at Art. XIII, § 1). The arbitrator also noted that the "hospital rights" provision allows the hospital to "implement professional standards of care" with 15 days notice to the union and an opportunity to discuss, if requested. Id. at 29 (quoting CBA at Art. XIII, § 4). The arbitrator also noted that, under Article V of the CBA, he "shall . . . have no power to rule against [the hospital] unless [the hospital] is found to have violated [the CBA]" and that he "shall have no power to add to, or subtract from or modify any of the terms of [the CBA]." Id. (quoting CBA at Art. V).

In addition, the arbitrator wrote that he would apply a "relativistic approach" to interpreting the CBA: "Arbitrators differ as to the role they envision in interpretation, the better weight favors a relativistic approach. Words themselves have no absolute meaning, but can only be understood through the eyes, ears, minds, assumptions and understandings of the parties." Arbitrator Decision at 26.

5

The CBA also contains a provision – the tenth paragraph of Article VII, § 1 – addressing part-time status: "A regular part-time Registered Nurse shall be regularly scheduled for less than forty (40) hours of work in a week but at least sixteen (16) hours in a work week." This provision has gone entirely unmentioned by both the parties and the arbitrator.[5]

The union filed this lawsuit on March 4, 2013, asking the Court to order the hospital to abide by the arbitrator's order to cease and desist from violating Article IX, § 6 of the CBA. The parties filed their cross-motions for summary judgment on May 20, 2013.

### III.  ANALYSIS

#### A.  Legal Standard Governing Judicial Review of Arbitrator Decisions

Judicial review of an arbitrator's decision is "extremely limited." Int'l Union v. Hurd Corp., 7 F. App'x 329, 333 (6th Cir. 2001). As explained by the Supreme Court: "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." United Paperworkers Int'l Union v. Misco, 484 U.S. 29, 37-38 (1987). Thus, courts must uphold an arbitrator's award "so long as it draws its essence from the collective bargaining agreement." United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960). In other words, as long as "an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." Major League Baseball Players Assoc. v. Garvey, 532 U.S. 504, 509 (2001). See also Brentwood Med. Assocs. v. United Mine Workers of Am., 396 F.3d 237, 241 (3d Cir. 2005) ("An award draws its essence from a collective bargaining agreement if its interpretation can <u>in any rational way</u> be derived

---

[5] The provision is not even reproduced in the "Relevant Contractual Provisions" section of the arbitrator's decision.

from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention." (emphasis in original)).

While an arbitrator may not "ignore the plain language of the contract," Misco, 484 U.S. at 38, "a court should not reject an award on the ground that the arbitrator misread the contract," id., and "a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 764 (1983). See also Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357, 360 (3d Cir. 1993) ("As a general rule, [courts] must enforce an arbitration award if it was based on an arguable interpretation and/or application of the collective bargaining agreement, and may only vacate it if there is no support in the record for its determination or if it reflects manifest disregard of the agreement, totally unsupported by principles of contract construction." (quotation marks omitted)); Int'l Truck & Engine Corp. v. United Steel Workers of Am., Local 3740, 294 F.3d 860, 861 (7th Cir. 2002) ("Only if 'there is no possible interpretive route to the award, so [that] a noncontractual basis can be inferred,' may the award be set aside." (quoting Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc., 935 F.2d 1501, 1506 (7th Cir. 1991)).

The Sixth Circuit has instructed courts in this circuit to ask the following questions in determining whether an arbitrator's award should be upheld:

> Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration? Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award? And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?

Mich. Family Res., Inc. v. Serv. Emps. Int'l Union Local 517M, 475 F.3d 746, 753 (6th Cir. 2007). "So long as the arbitrator does not offend any of [the above] requirements, the request for

7

judicial intervention should be resisted even though the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute." Id. And regarding the last question of the Michigan Family Resources framework – whether the arbitrator was "arguably construing or applying the contract" – the Sixth Circuit has held that doubts on the issue should be resolved in favor of enforcement of the arbitrator's decision:

> [Courts] cannot ignore the specter that an arbitration decision could be so ignorant of the contract's plain language as to make implausible any contention that the arbitrator was construing the contract. An interpretation of a contract thus could be so untethered to the terms of the agreement . . . that it would cast doubt on whether the arbitrator indeed was engaged in interpretation. Such an exception of course is reserved for the rare case. For in most cases, it will suffice to enforce the award that the arbitrator appeared to be engaged in interpretation, and if there is doubt we will presume that the arbitrator was doing just that.

Id. (citations, brackets, and quotation marks omitted).

### B. Legal Standard Governing Construction of CBAs

The Sixth Circuit has summarized the rules governing construction of CBAs as follows:

> [W]hen interpreting a collective bargaining agreement, a court must start with the explicit language. General principles of contract interpretation should guide a district court's interpretation of the explicit language.[FN] When a contractual provision is ambiguous, the court may turn to extrinsic evidence.
>
> > [FN] In interpreting a CBA, courts must (1) look to the explicit language, (2) evaluate that language in light of the context that led to its use, (3) interpret each provision as part of the integrated whole, (4) construe each provision consistently with the entire document and the relative positions and purposes of the parties, (5) construe the terms so as to render none nugatory and to avoid illusory promises, (6) look to other words and phrases in the document to resolve ambiguities, and (7) review the interpretation for consistency with federal labor policy.

Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 489 (6th Cir. 2009) (citations, quotation marks, and ellipses omitted).

### C. The Parties' Arguments

8

The hospital urges the Court to vacate the arbitrator's decision because, according to the hospital, the arbitrator's conclusion that 12/72-hour nurses are part-time for the purposes of Article IX, § 6 of the CBA ("there shall be no normal work day or normal work week for part-time employees") is inconsistent with the first paragraph of Article VII, § 1 of the CBA, which provides, in pertinent part, that "regular full-time Registered Nurses have been regularly scheduled in 8, 10, or 12 hour shifts for 36-40 hours of work in a week . . ." The hospital relies on six cases in support of its argument. See Ficks Reed Co. v. Local Union 112, 965 F.2d 123 (6th Cir. 1992); Int'l Union v. Hurd Corp., 7 F. App'x 329 (6th Cir. 2001); Totes Isotoner Corp. v. Int'l Chem. Workers Union Council/UFCW Local 664C, 532 F.3d 405 (6th Cir. 2008); Int'l Bhd. of Elect. Workers v. Toshiba Am., Inc., 879 F.2d 208 (6th Cir. 1989); Sears, Roebuck & Co. v. Teamsters Local Union No. 243, 683 F.2d 154 (6th Cir. 1982); Dematic Corp. v. Int'l Union, 635 F. Supp. 2d 662 (W.D. Mich. 2009). These cases are discussed below.

Conversely, the union urges the Court to enforce the arbitrator's decision. The union argues that the arbitrator was correct to classify 12/72-hour nurses as part-time because that classification is consistent with the testimony of Barbara Chubb, who (i) testified that 12/72-hour nurses (i.e., nurses with a code status of 0.9) are part-time and (ii) explained that the hospital refused the union's proposal, made during the bargaining process, to treat 0.9 status nurses as full-time for all purposes (and not just for benefits purposes). See Pl. Resp. at 8-9. The union also argues, without elaboration, that "the meaning of the plain language of the contract is consistent with the testimony presented at the hearing" and that "[t]he Hospital's assertion that Arbitrator Dobrey [sic] ignored a controlling provision of the CBA is incorrect and irrelevant." Pl. Resp. at 9. The union does not explain why it believes that it is "irrelevant" whether the arbitrator ignored a controlling provision of the CBA and likewise does not explain why it

9

believes that the hospital is "incorrect" in arguing that the arbitrator ignored a controlling provision of the CBA. Further, the union does not attempt to analogize the factual circumstances of this case to other cases; the authority cited by the union discusses only general legal principles.

Alternatively, the union argues that, even if the hospital is correct that 12/72-hour nurses are full-time under the CBA, the hospital does not dispute that at least some of the nurses are unquestionably part-time because they work less than 72 hours. See id. at 9-10. However, the Court does not address this argument because, for the reasons stated below, it agrees with the union's primary argument, discussed in the preceding paragraph.

Finally, the union argues (very briefly) that the hospital waived its right to rely on the first paragraph of Article VII, § 1 of the CBA in support of its argument that 12/72-hour nurses are full-time because, according to the union, the hospital failed to advance the argument in the proceedings before the arbitrator. See Pl. Resp. at 10. In support of its waiver argument, the union cites Zingg v. Department of Treasury, 388 F.3d 839 (Fed. Cir. 2004) (issues not raised before arbitrator are waived in subsequent federal-court lawsuit). In its reply, the hospital argues that it did, in fact, raise the first paragraph of Article VII, § 1 in the underlying proceedings before the arbitrator, and distinguishes Zingg on that basis. See Def. Reply at 1 n.2. Because the record clearly reflects that the hospital did raise the argument in the proceedings before the arbitrator that 12/72-hour nurses are full-time pursuant to the first paragraph of Article VII, § 1 of the CBA, see Def. Post Hearing Brief (Dkt. 18-2) (highlighted portions), the Court summarily rejects the union's waiver argument as without evidentiary support.

### D. Discussion

The arbitrator concluded that the hospital's implementation of pattern scheduling for 12/72-hour nurses, who he held were part-time nurses, violated Article IX, § 6 of the CBA, which prevents the hospital from implementing a "normal work day or normal work week for part-time employees." Notably, the hospital does not take issue with the arbitrator's conclusion that pattern scheduling for part-time nurses violates Article IX, § 6 of the CBA, and the Court therefore need not determine whether that conclusion draws its essence from the CBA. Rather, the sole focus of the hospital's attack on the arbitrator's decision is the arbitrator's conclusion that 12/72-hour nurses are part-time nurses, and thus shall not be subject to "normal" work schedules in accordance with § 6 of Article IX.

In reaching the conclusion that 12/72-hour nurses are part-time, the arbitrator relied on Article IX, § 2 of the CBA and the testimony of Barbara Chubb, the union's chief steward. Article IX, § 2 provides: "Twelve (12) hour bargaining unit employees normally scheduled for seventy-two (72) hours within a given pay period shall be considered full time for purposes of benefits." Although this provision does not provide that 12/72-hour nurses are part-time for purposes other than benefits, the arbitrator relied on the testimony of Chubb to infer that conclusion. According to the arbitrator, "Chubb testified without contradiction from Hospital witnesses that there are no 1.0 point status nurses employed by the Hospital; all are 0.9 point or less and all are considered part time." Id. at 34.[6] Thus, based on Article IX, § 2 of the CBA

---

[6] Earlier in the arbitrator's decision, the arbitrator noted:

> All nurses working 72 hours in a pay period are considered .9 status employees, or part-time, for all purposes except benefits. This term was fairly bargained for by the parties. Indeed, the Union sought to have these .9 status nurses considered full time for all purposes, but the Hospital did not agree to expand their full-time recognition beyond that which related to benefits.

Arbitrator Opinion at 16 n.3.

(which is ambiguous as to whether 12/72-hour nurses are considered full- or part-time for purposes other than benefits) and Chubb's testimony (which sheds light on that ambiguity), the arbitrator concluded that 12/72-hour nurses are part-time and, accordingly, cannot be subjected to "normal" work schedules. Because the arbitrator found that pattern scheduling imposes "normal" work schedules on 12/72-hour nurses, the arbitrator concluded that the hospital violated Article IX, § 6 of the CBA by imposing pattern scheduling on that class of employees. See Arbitrator Decision at 33-34.

The hospital argues that the arbitrator's conclusion that 12/72-hour nurses are part-time cannot stand because the conclusion is in direct conflict with one particular provision of the CBA – the first paragraph of Article VII, § 1 – and thus does not draw its essence from the CBA. The first paragraph of Article VII, § 1 reads as follows:

> While regular full-time Registered Nurses have been regularly scheduled in 8, 10, or 12 hour shifts for 36-40 hours of work in a week, the determination of any change in code status for any Registered Nurse shall be made by the Hospital as provided in Article XIV, Section 17. A regular full-time Registered Nurse's Hospital seniority shall date from her most recent starting date of hire by the Hospital. A regular full-time Registered Nurses' bargaining unit seniority shall date from her most recent starting date of work in any classification within the bargaining unit.

According to the hospital, this provision is controlling of the question whether 12/72-hour nurses are full- or part-time, and mandates a conclusion that they are full-time because the first paragraph of Article VII, § 1 "defines regular full-time RN status," Def. Br. at 6, as nurses who "have been regularly scheduled in 8, 10, or 12 hour shifts for 36-40 hours of work in a week." Id. (quoting CBA at art. VII, § 1).

The Court rejects the hospital's argument and concludes that the arbitrator's determination that 12/72-hour nurses are part-time draws its essence from the CBA and does not contradict an unambiguous CBA provision. The first paragraph of Article VII, § 1 of the CBA is

12

the allegedly unambiguous CBA provision that the hospital cites as being inconsistent with the arbitrator's conclusion that 12/72-hour nurses are part-time. However, that provision does not say what the hospital claims it says, inasmuch as it does not unambiguously provide that 12/72-hour nurses are full-time for purposes other than benefits. Importantly, the provision does not indisputably contain a definition of full-time nurses. Rather, by providing that full-time nurses "have been regularly scheduled in 8, 10, or 12 hour shifts for 36-40 hours of work in a week," the provision may reasonably be read as imparting an historical perspective, i.e., that full-time nurses historically worked 36-40 hours in a week, but not necessarily anymore. Notably, the provision is not drafted in the typical nomenclature for the definition a contractual term. For example, there is no declarative command or use of the future tense, such as "Full-time nurses shall include nurses who work 36-40 hours." Language of that sort would carry indisputable indicia of a definition for full-time nurses. Because the provision contains no such indicia, the hospital's entire argument that the arbitrator ignored a provision that unambiguously contradicted his conclusion must fail.

In addition, the Court notes that the arbitrator did not err in considering the testimony of Barbara Chubb to help resolve the ambiguity of the first paragraph of Article VII, § 1. See Int'l Paper Co. v. United Paperworkers Int'l Union, 215 F.3d 815, 817 (8th Cir. 2000) ("arbitrator may look to outside sources to aid in interpreting a CBA" so long as "he [is] construing the contract, not amending it."); Bureau of Engraving, Inc. v. Graphic Commc'ns Int'l Union, Local 1B, 164 F.3d 427, 429 (8th Cir. 1999) ("The essence of the CBA is derived not only from its express provisions, but also from the industrial common law," including "the past practices of the industry and the shop, as well as the parties' negotiating history and other extrinsic evidence of their intent.").

13

In any event, the ultimate correctness of the arbitrator's determination that 12/72-hour nurses are considered part-time for purposes other than benefits is confirmed by a CBA provision that the parties, and thus the arbitrator, have not cited – either during the administrative proceedings below or during the present proceedings. The unmentioned provision is the tenth paragraph of Article VII, § 1. It provides: "A regular part-time Registered Nurse shall be regularly scheduled for less than forty (40) hours of work in a week but at least sixteen (16) hours in a work week." This provision is much closer to a definition of part-time than the first paragraph of Article VII, § 1 is a definition of full-time, and it provides that part-time nurses "shall be" regularly scheduled (as opposed to "have been" regularly scheduled) less than 40 hours per week and more than 16 hours per week, and 12/72-hour nurses fit the bill. Thus, the tenth paragraph of Article VII, § 1 strongly supports the arbitrator's determination that 12/72-hour nurses (i.e., nurses who work 36 hours per week) are part-time for purposes other than benefits, as 36 is more than 16 but less than 40. The Court can enforce the arbitrator's award based on any grounds that are supported by the record, see Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 390 (2d Cir. 2003) ("Even where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case."), and the Court does so here based on the tenth paragraph of Article VII, § 1, which is not inconsistent with the first paragraph of Article VII, § 1.

In sum, the hospital has not shown that the arbitrator ignored a controlling CBA provision, and the arbitrator's determination that 12/72-hour nurses are part-time for purposes other than benefits is a plausible interpretation of the CBA that is supported by the record, namely, Article IX, § 2 of the CBA combined with the testimony of Barbara Chubb. This conclusion is even more apparent in light of the tenth paragraph of Article VII, § 1, which

strongly supports the conclusion that 12/72-hour nurses are part-time for purposes other than benefits. For these reasons, this is not a case in which "there is no support in the record" for the arbitrator's decision, see Exxon Shipping, 993 F.2d at 360, and the arbitrator's decision must be enforced.

The hospital relies on six cases in support of its argument that the arbitrator's decision that 12/72-hour nurses are part-time for purposes other than benefits does not draw its essence from the CBA. However, five of the six cases are distinguishable because, in those cases, the arbitrator's decision was deemed to be in direct conflict with an unambiguous provision of the governing CBA, and the final case is not helpful because it addresses issues that are not presented here.

In Ficks Reed, the Sixth Circuit affirmed the district court's decision to vacate an arbitrator's award, holding that the award did not draw its essence from the CBA because it ignored key language in the agreement that was directly applicable to the parties' dispute. Because the arbitrator's decision was in direct conflict with the express and unambiguous terms of the CBA, the Sixth Circuit affirmed the district court's decision vacating the arbitrator's award.

In Hurd Corporation, the Sixth Circuit reversed the district court's decision to enforce an arbitrator's decision, holding that the decision must be vacated because it was in direct conflict with the unambiguous language of the applicable CBA and, therefore, did not draw its essence from the CBA. Specifically, the CBA provided that departing employees who worked between 26 and 39 weeks were entitled to partial vacation benefits so long as they were either laid off for a documented medical reason or retired. Historically, the employer paid out partial vacation benefits to any employee who worked between 26 and 39 hours – regardless of whether the

employee was laid off for medical reasons or had retired – even though it was not contractually obligated to do so under the CBA. However, the employer eventually stopped its generosity and began following the precise terms of the CBA, resulting in the denial of partial vacation benefits to 74 employees who worked between 26 and 39 hours and who had been laid off for reasons other than legitimate illness or retirement. The union filed a grievance on behalf of those 74 employees, and the arbitrator ruled in favor of the union. When the employer refused to abide by the arbitrator's decision, the union brought suit in federal court seeking an enforcement of the arbitrator's award; the employer resisted on the ground that the award conflicted with the terms of the CBA. The district court, in upholding the arbitrator's decision, noted that, while "the arbitrator appears to have misread the collective bargaining agreement . . . his award represents a plausible interpretation of the contract in light of the uncontradicted evidence of past practice." In other words, the district court upheld the award because the contract language was not ignored; rather, it was merely misapplied, thus resulting in an award that, according to the district court, drew its essence from the CBA inasmuch as it at least attempted to construe the language of the agreement. The Sixth Circuit reversed, holding that an award that conflicts with the express, unambiguous terms of the collective bargaining cannot be upheld even if the arbitrator did not ignore – but merely misapplied – the relevant language.

In Sears, the Sixth Circuit affirmed the district court's decision to vacate an arbitrator's award because the arbitrator disregarded CBA language that was unquestionably controlling. The employer in Sears subcontracted the work of a unit of workers, resulting in 90 layoffs. The subcontracting clause of the applicable CBA allowed the employer to subcontract work so long as the work could be performed "more efficiently and economically outside of the bargaining unit." Although the arbitrator found that the employer adequately demonstrated that the work

could be performed more efficiently outside of the bargaining unit, he nevertheless engaged in a balancing test not authorized by the CBA in which he concluded that the costs to the union of subcontracting outweighed the benefits to the employer. On that rationale, the arbitrator ordered the employer to reinstate the laid off workers, prompting the employer to file suit in federal court. The district court vacated the award, and the Sixth Circuit affirmed, both holding that arbitrators lack authority to disregard or modify unambiguous contract language.

In Toshiba America, another case in which an arbitrator's decision was vacated, several employees were discharged for participating in a strike in violation of a no-strike provision contained in the applicable CBA. Although the CBA contained a provision expressly allowing the employer to discharge employees who participated in strikes, the arbitrator ordered the employer to reinstate the striking employees because he found that the employer had orally agreed with the union not to discharge employees who participated in the strike, and that the oral agreement overrode the express terms of the CBA. The district court and the Sixth Circuit refused to enforce the arbitrator's decision, holding that it was in direct conflict with the CBA: "While we realize that great deference must be granted to the arbitrator's interpretation of the contract, the arbitrator's action in this case amounts to a total disregard of the plain language of the contract." Id. at 210-11.

In Dematic Corporation, the arbitrator ordered the employer to pay laid off employees fringe benefits for a period of six months following the layoff, based on the past practice of the employer and the expectations of the employees, despite unambiguous language in the applicable CBA requiring that the employer only pay the fringe benefits for a period of three months following the layoff. The court refused to enforce the arbitrator's decision because "the arbitrator was not even arguably construing or applying the CBA" and "disregarded [the

pertinent CBA language] . . . rather than consulting [it] and attempting in good faith to apply [it] as written." Id. at 678-79.

Ficks Reed, Hurd Corporation, Sears, Toshiba America, and Dematic Corporation are all distinguishable from the present case because, in those cases, the arbitrator's decision or analysis was in direct conflict with an unambiguous provision of the governing CBA whereas, here, the hospital has not established that the arbitrator's conclusion that 12/72-hour nurses are part-time for purposes other than benefits is in direct conflict with the first paragraph of Article VII, § 1, or any other provision of the CBA. Moreover, unlike in the five cases on which the hospital relies where there was no support in the CBA for the arbitrator's decision, the tenth paragraph of Article VII, § 1 of the present CBA fully and strongly supports the arbitration's conclusion.

The hospital also relies on Totes Isotoner, another case in which the arbitrator's decision was vacated. However, Totes is not helpful here because it involves issues that are not presented here.[7]

---

[7] In Totes, the arbitrator determined that the employer violated the pertinent CBA by unilaterally changing Appendix C of the CBA (outlining the employer's obligations with respect to the insurance coverage of union members) – resulting in an increase in the insurance premiums of union members – despite a CBA provision prohibiting unilateral changes to the CBA. As a result of the violation, the arbitrator ordered the employer to rescind the unilateral changes made to Appendix C and to reimburse those employees who had paid increased premiums under the unilaterally changed Appendix C. In the meantime, a new CBA became effective containing a provision that was identical to the original version of Appendix C, and an issue arose as to whether the arbitrator's award – which interpreted only the old CBA – required to the employer to reimburse union members who had paid increased premiums during the life of the new CBA (i.e., after the date on which the old CBA expired). The arbitrator held "supplemental proceedings" to resolve this issue, ultimately finding that the employer violated the original arbitration award because "[t]he improper action that occurred during the [life of the old CBA] simply carried over into the [new CBA]." To reach that this conclusion, the arbitrator had to interpret the new CBA inasmuch as his conclusion depends on the fact that the two CBAs contain identical Appendix Cs.

The employer filed suit in federal court alleging that the supplemental award should be vacated because the arbitrator acted outside the scope of his authority by interpreting the new CBA

18

Finally, the hospital emphasizes the arbitrator's statement that he would apply a "relativistic approach" to interpreting the CBA, see Arbitrator Decision at 26, arguing that the statement reflects the arbitrator's propensity to discount the importance of the words contained in the CBA. The hospital writes: "Apparently, Arbitrator Dobry holds, contrary to Supreme Court precedent and lower court decisions, that the CBA does not necessarily mean what is says!" Def. Br. at 1 n.2. This argument is without merit. The arbitrator's statement that he would apply a "relativistic approach" is not inconsistent with Sixth Circuit precedent. "Relativistic" is defined as "of, relating to, or characterized by relativity or relativism," and "relativism" is defined as "a view that . . . truths depend on the individuals and groups holding them." See http://www.merriam-webster.com/dictionary. The Sixth Circuit has instructed that, in construing a CBA, in addition to looking at the explicit language of the CBA, courts should "evaluate [the] language in light of the context that led to its use," "interpret each provision as part of the integrated whole," and "construe each provision consistently with the entire document and the relative positions and purposes of the parties." Tackett, 561 F.3d at 489 n.7. Tackett's language is not inconsistent with – and, indeed, seems to authorize – a "relativistic approach."

In any event, the hospital's concern about the "relativistic approach" statement ignores the line immediately preceding that statement, in which the arbitrator wrote that he "must presume that the parties chose their words purposefully and on an informed basis." Moreover, the arbitrator's decision as a whole indicates that he deemed the language of the CBA to be

---

instead of just the old one. The district court vacated the supplemental award, and the Sixth Circuit affirmed. The issue was whether the arbitrator had authority to interpret the new CBA in enforcing a prior arbitration award that was based on the old CBA. The Sixth Circuit held that, because the question in the supplemental proceedings – whether the prior arbitration award had effect after the expiration of the CBA on which the award was based – required interpretation of a CBA that was not originally before the arbitrator, the arbitrator exceeded the scope of his authority by interpreting the new agreement.

controlling of his analysis. For all the reasons stated above, the Court concludes that the arbitrator's conclusion that 12/72-hour nurses are part-time is not in direct conflict with the first paragraph of Article VII, § 1 addressing full-time status. The arbitrator's decision draws its essence from the CBA and the Court, therefore, has no authority to vacate it.

## IV. CONCLUSION

For the reasons stated above, the Court enforces the arbitrator's decision and, accordingly, grants the union's motion for summary judgment (Dkt. 12) and denies the hospital's motion for summary judgment (Dkt. 13). A separate judgment shall issue.

SO ORDERED.

s/Mark A. Goldsmith

Dated: August 22, 2013  MARK A. GOLDSMITH
Flint, Michigan  UNITED STATES DISTRICT JUDGE

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 22, 2013.

s/Amanda Chubb for Deborah J. Goltz
DEBORAH J. GOLTZ
Case Manager